IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHARLES THURMAN, <br><br> Plaintiffs, <br><br> v. <br><br> PREMIER SECURITY CORPORATION and APEX3 SECURITY, <br><br> Defendants. | Case No. 1:18-cv-3098 |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendant Apex3 Security Corporation ("Apex3") and Defendant Premier Security Corporation ("Premier") state as follows for their Answer and Affirmative Defenses to the First Amended Complaint filed by Plaintiff, Charles Thurman.

1. Thurman contends that Defendants violated the Fair Labor Standards Act of 1938, 29 §U.S.C. §§ 201, *et seq.* ("FLSA") by knowingly and intentionally discharging Thurman from his position as Director of Security in retaliation for Thurman's complaints regarding Defendants' failure and refusal to properly pay certain employees, namely Security Shift Managers, for all overtime hours worked in excess of 40 hours per week.

**ANSWER:** Defendants deny the allegations in paragraph 1.

2. Plaintiff Charles Thurman is a citizen of the State of Illinois who worked for Defendants as the Director of Security and Public Safety at Northshore University HealthSystem's Evanston Hospital. Throughout this period, Thurman was an "employee' 'as defined by the FSLA, 29 U.S.C. §203(e)(1).

**ANSWER:** Defendants admit the allegations in paragraph 2.

3. Defendant Premier Security Corporation is an Illinois corporation, headquartered in Illinois that provides contract security officer programs for properties throughout the Chicago metropolitan area. Upon information and belief, Defendant Premier is the parent company of Defendant Apex3 Security. At all times relevant, Premier was Thurman's "employer" as defined by the FLSA, 29 U.S.C. §203(d) and was actively engaged in the conduct described herein.

**ANSWER:** Except to deny that Defendant Premier is the parent company of Defendant Apex3, Defendants admit the allegations in paragraph 3.

4. Defendant Apex3 Security ("Apex3") is an Illinois corporation, headquartered in Illinois that provides security services throughout the Chicagoland area. At all times relevant, Apex3 was Thurman's "employer" as defined by the FLSA, 29 U.S.C. §203(d) and was actively engaged in the conduct described herein.

**ANSWER:** Except to deny that Plaintiff was terminated in retaliation for complaining about overtime compensation, Defendants admit the allegations in paragraph 4.

5. This Court has subject-matter jurisdiction over this action pursuant to 29 U.S.C. §216(b), which provides that suit under the FLSA "may be maintained against any employer… in any Federal or State court of competent jurisdiction."

**ANSWER:** Defendants admit the allegations in paragraph 5.

6. This Court has jurisdiction over Thurman's claims pursuant to 28 U.S.C. §1331 because Thurman's claims arise under the FLSA.

**ANSWER:** Except to deny that Plaintiff was terminated in retaliation for complaining about overtime compensation, Defendants admit the allegations in paragraph 6.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Defendants reside in and conduct business within, this District and because the actions and omissions giving rise to the claims pled in this Complaint occurred within this District.

**ANSWER:** Except to deny that Plaintiff was terminated in retaliation for complaining about overtime compensation, Defendants admit the allegations in paragraph 7.

2

8.  Upon information and belief, Defendants enter into contracts with clients to provide professional uninformed security personnel and other services throughout the Chicagoland area.

**ANSWER:** Defendants admit the allegations in paragraph 8.

9.  Upon information and belief, Northshore University HealthSystem ("NUHS") is one of Defendants' clients.

**ANSWER:** Defendants admit the allegations in paragraph 9.

10.  Thurman worked for Defendants as a full-time Director of Security at NUHS's Evanston Hospital in Evanston, Illinois from June, 2016 until November 30, 2016.

**ANSWER:** Defendants admit the allegations in paragraph 10.

11.  Thurman's responsibilities included, amongst other things, managing a team of approximately sixty (60) security personnel, managing Defendants' security department and handling scheduling and attendance of security guards and shift supervisors. At the beginning of his employment, Thurman reported to Tony Ringgold, Corporate Director, who in turn reported to Michael Potter, Vice President of Operations.

**ANSWER:** Defendants admit the allegations in paragraph 11.

12.  During his first week of employment, Thurman was introduced to Defendants' payroll and scheduling software, "WinTeam." Upon information and belief, Tony Ringgold and Rod Adar were responsible for managing Defendants' payroll.

**ANSWER:** Defendants admit the allegations in paragraph 12.

13.  Approximately ten days after Thurman began his employment, Mr. Ringgold resigned and Thurman was tasked with managing and executing the payroll by Michael Potter.

**ANSWER:** Defendants admit that Mr. Ringgold resigned after Thurman began his employment and admit the remaining allegations in paragraph 13 but further state that Plaintiff was assisted in the process of executing payroll by Michael Potter and other NorthShore Directors.

14. Without any substantial training on WinTeam, Thurman was assigned certain payroll responsibilities, which he performed.

**ANSWER:** Defendants deny that Plaintiff was not provided with any substantive training but admit the remaining allegations in paragraph 14.

15. Shortly thereafter, Thurman was approached by a Security Shift Manager, who complained about the miscalculation of her overtime pay.

**ANSWER:** Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 but deny that they were aware of any complaints by Security Shift Managers.

16. When Thurman investigated her complaint, he noticed that Defendants' WinTeam software system had been manually changed to pay all Security Shift Managers a $12.00 flat rate (also referred to as "Director's Pay") for any hours worked in excess of 40, as opposed to 1½- times their regular hourly rate.

**ANSWER:** Defendants deny that the WinTeam software system had been manually changed to reflect a $12.00 flat rate as opposed to 1.5 time their regular rate. Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 16.

17. Thurman immediately alerted Michael Potter of the issue, who responded that this was the way Defendants paid Security Shift Managers and gave Thurman a verbal directive to continue to do so. Thurman then requested an explanation as to why they were being paid less than time-and-one-half, to which Michael Potter told Thurman, "[l]ook, just do it. Shut up and do what I tell you."

**ANSWER:** Defendants deny the allegations in paragraph 17.

18. From approximately the end of June, 2016 to September of 2016, each time Thurman was required to run payroll for Defendants, Thurman brought to the attention of Michael Potter that they were not paying Security Shift Managers the proper time-and-one-half overtime rate. Thurman also escalated all complaints he received from Security Shift Managers to Michael Potter.

**ANSWER:** Defendants deny the allegations in paragraph 18.

19. Each time Thurman ran payroll, he refused to pay the Security Shift Managers less than time-and-on-half their regular hourly rate. However, Defendants would manually change the WinTeam system from time-and-one-half to "Director's Pay" for any hours worked in excess of 40 hours.

**ANSWER:** Defendants deny the allegations in paragraph 19.

20. From approximately June of 2016 to September of 2016, on three separate occasions, Thurman noticed that someone else had accessed the WinTeam system and changed the payroll to "Director's Pay" for Security Shift Managers.

**ANSWER:** Defendants deny that the payroll system was changed to reflect "Director's Pay" for Shift Managers. Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 20.

21. In approximately October of 2016, Sean Chipek was hired as Defendants' new Corporate Director, replacing Mr. Ringgold. When Security Shift Managers began complaining of the miscalculation of their overtime pay to Mr. Chipek, he raised the issue with Thurman. Thurman informed him that he believed the overtime compensation was wrong and that he refused to manually code their overtime pay to "Director's Pay," or less that 1½-time their regular hourly rate.

**ANSWER:** Except to admit that Shawn Chipek was hired in or about October 2016 as Corporate Director, Defendants deny the allegations in paragraph 21.

22. Soon thereafter, Mr. Chipek informed Thurman that he was required to pay the Security Shift Managers at a "Director's Pay" rate for any and all overtime hours worked. Thurman refused.

**ANSWER:** Defendants deny the allegations in paragraph 22.

23. The next time Thurman ran payroll, at approximately the end of October, 2016, Defendants' WinTeam software had been changed to automatically code any Security Shift Managers' overtime pay at a "Director's Pay" rate of $12.00 per hour. Around this time, Michael Potter also removed Thurman's access and ability to manually change the overtime rate in Defendants' WinTeam system, and informed Thurman that if he attempted to change the overtime rate for Security Shift Managers, he would be let go.

**ANSWER:** Defendants deny the allegations in paragraph 23.

5

24. On or around November 15, 2017, Thurman was terminated by Defendants, in direct retaliation for his complaints and refusal to take part in Defendants' scheme to withhold Security Shift Managers' earned overtime pay, in direct violation of the FLSA and state law.

**ANSWER:** Except to admit that Plaintiff's employment was terminated, Defendants deny the allegations in paragraph 24.

## COUNT I
## VIOLATION OF FLSA – Retaliatory Discharge

25. Thurman incorporates the foregoing allegations as though fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to paragraph 1-24 as if fully set forth herein.

26. Defendants have violated 29 U.S.C. §215(a)(3) by discharging Thurman because he voiced his concerns and complaints to Defendants for violating the FLSA in failing and refusing to pay overtime to certain employees, namely shift supervisors, of Defendants.

**ANSWER:** Defendants deny the allegations in paragraph 26.

27. As a direct and proximate result of this unlawful discharge, Thurman is entitled under 29 U.S.C. § 216(b) to recover from Defendants such legal and equitable relief as may be appropriate to effectuate the purposes of 29 U.S.C. § 215(a)(3), including without limitation, payment of wages and benefits lost, and an additional equal amount as liquidated damages. Thurman is also entitled to reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**ANSWER:** Defendants deny the allegations in paragraph 27.

28. As a direct and proximate result of his unlawful discharge, Thurman suffered and continues to suffer emotional distress, embarrassment and humiliation.

**ANSWER:** Defendants deny the allegations in paragraph 28.

29. The actions of Defendants in unlawfully discharging Thurman were done intentionally, willfully, and wantonly and with reckless disregard for the rights and well-being of Thurman, as well as certain employees of Defendants who should have been paid overtime, such that Thurman should also be

6

awarded punitive damages in an amount which will punish Defendants and discourage others from similar conduct.

**ANSWER:** Defendants deny the allegations in paragraph 29.

### AFFIRMATIVE DEFENSES

1. Plaintiff was terminated for legitimate business reasons.

2. Plaintiff did not engage in any protected activity.

3. At all times, Defendants acted in good faith attempting to comply with their obligations under state and federal laws. Accordingly, liquidated damages, penalties and other forms of punitive damages are not warranted or available.

**WHEREFORE**, Defendants respectfully request that Plaintiff's Complaint be dismissed with prejudice and that Defendants be awarded the attorney's fees and costs incurred in obtaining dismissal.

Respectfully submitted,

**ILLINOIS CENTRAL SCHOOL BUS, LLC**

By: /s/ Kerry Saltzman
    One of Its Attorneys

Kerry E. Saltzman
Aaron W. Chaet
WILLIAMS, BAX & SALTZMAN, P.C.
221 North LaSalle St.
Suite 3700
Chicago, Illinois 60601
(312) 372-3311